645 A.2d 811

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Derrick RAGAN, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 24, 1994.

Decided July 29, 1994.

4

8

Eugene P. Tinari, Philadelphia, for D. Ragan.

Catherine Marshall, Philadelphia, for Com.

Hugh J. Burns, Jr., Philadelphia, Robert A. Graci, Harrisburg, for Atty. Gen.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION

MONTEMURO, Justice.

This a direct appeal[1] from a judgment of sentence imposing a penalty of death entered in the Court of Common Pleas of

1. 42 Pa.C.S. § 9711(h) requires an automatic review by this court of all cases in which the death penalty is imposed as it states,

(h) Review of death sentence.-

(1) A sentence of death shall be subject to automatic review by Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings as provided in paragraph (4).

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

Philadelphia County following appellant's convictions for murder of the first degree[2], possessing instruments of crime generally[3], and recklessly endangering another person.[4] After a thorough review of the evidence in the instant case and the issues raised by appellant, we affirm his sentence of death.

This case arises from an incident which claimed the life of the victim, Darren Brown, on June 26, 1990. At approximately 4:00 p.m. on that date the victim's brother, Wendell Brown, became involved in an altercation over who should use a basketball court with one William Wingate, a friend of appellant's, at the Tustin playground in West Philadelphia. The fight, however, was broken up and Wendell left the playground. Wendell later returned to the playground where he encountered appellant, whom he had seen earlier with Wingate. Wendell told appellant to tell Wingate that a basketball game was not worth fighting over. Appellant said, "you're right" and claimed he would convey the message.

Believing his feud with Wingate was now over, Wendell returned to the playground later that evening with Marcus Watson and several other friends. While Wendell Brown was standing in the playground, Wingate and another man approached him from behind and began bludgeoning Mr. Brown with a baseball bat. The two men then retreated up a flight of nearby steps when Darren Brown came to his brother's aid. Wendell urged Darren that he was all right but Darren responded, "No f___k that, no one f___ks with my brother." He

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

(4) If the Supreme Court determines that the death penalty must be vacated because none of the aggravating circumstances are supported by sufficient evidence or because the sentence of death is disproportionate to the penalty imposed in similar cases, then it shall remand for the imposition of a life imprisonment sentence. If the Supreme Court determines that the death penalty must be vacated for any other reason, it shall remand for a new sentencing hearing pursuant to subsections (a) through (g).

2. 18 Pa.C.S. § 2502(a)

3. 18 Pa.C.S. § 907(a)

4. 18 Pa.C.S. § 2705

then pointed a finger at the top of the steps and said, "Let's go get them."

The two brothers started up the steps in pursuit of Wendell's assailants, with Darren in the lead. As the two passed appellant who was standing on the steps, Wendell turned and noticed appellant drawing a pistol from his waistband. Wendell punched appellant in the face, shouted for Darren to run, and then fled up the steps. Darren, however, froze and was shot in the chest. He fled a short distance then collapsed. Appellant fired three or four shots at Wendell, who escaped unharmed, and then pursued his already wounded victim. Standing over his victim, he pumped shot after shot into Darren Brown's prostrate body. Appellant then waved his weapon at the crowd and asked, "Does anybody else want some of this?"

Philadelphia Police Officer Rufus Harley and his partner arrived at the scene shortly after the shooting and found a crowd of approximately two hundred people scrambling for the exits of the playground. Upon entering, they found the body of Darren Brown lying face down in a pool of blood. He had been shot thirteen times.[5]

After the shooting, appellant fled to the home of his girlfriend, Tameka Brown. At 5:30 a.m. the next morning, he called his friend Kerry Pleasant and arranged for Pleasant to pick him up at Tameka Brown's residence at 6:00 a.m. The two then drove to North Philadelphia where Pleasant dropped off appellant.

Appellant remained at large until July 12, 1990, when he was arrested and charged with the murder of Darren Brown. The case proceeded to a jury trial before the Honorable Paul Ribner. In addition to physical evidence recovered at the crime scene, the Commonwealth introduced the testimony of Wendell Brown and Marcus Watson. Since he had been fleeing for his life at the time of the shooting, Brown had not actually seen appellant shoot his brother; however, he did

---

5. The ballistics evidence introduced at trail, as well as several witnesses, suggested that there was at least one additional gunman, who was never identified.

identify appellant as the individual whom he had seen pull a gun as he and his brother ran up the steps of the playground. Watson had witnessed the shooting and identified appellant as Darren Brown's slayer. In addition, both Brown and Watson had identified appellant from a photo array and in a lineup. The Commonwealth also introduced a statement made to the police by an individual named Hiram Smith on July 10, 1990, in which Smith had identified appellant as the man who had "emptied the clip" of his gun into Darren Brown. Smith, however, had moved to Georgia upon receipt of his first court notice, and at trial denied that he had been able to identify appellant.

Appellant, meanwhile, presented an alibi defense in which he claimed to have arrived at Tameka Brown's house at 5:00 p.m. on June 26, 1990, and to have been there at the time of the shooting. The defense presented the testimony of Ms. Brown to corroborate appellant's story, as well as two witnesses, Daniel Hunter and Tyrone Simmons, who claimed appellant was not at the Tustin playground at the time of the shooting. The defense also introduced the testimony of Kerry Pleasant who claimed appellant had called him from Tameka Brown's residence at the time of the shooting to arrange to have Pleasant pick him up at 6:00 a.m. the following morning.

At the close of the evidence, the jury found appellant guilty of murder in the first degree as well as possession of an instrument of crime, and reckless endangerment of another.[6]

Following the jury's verdict, a sentencing hearing was held pursuant to 42 Pa.C.S. § 9711(a). At the hearing the Commonwealth offered two aggravating circumstances: 1) that appellant had previously been convicted of first degree murder for the June 15, 1990, slaying of Anthony Thomas [7] and 2) that

6. The jury found appellant not guilty of aggravated assault.

7. 42 Pa.C.S. § 9711(d)(10):

The defendant has been convicted of another Federal or State offense, committed before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

appellant had placed others in grave risk of danger in committing the murder of Darren Brown.[8] Appellant in turn offered the testimony of himself and his mother that appellant had been a "warm and loving" son. The jury subsequently found two mitigating circumstances and one aggravating circumstance (based on appellant's previous murder conviction) and sentenced appellant to death.

On March 18, 1992, the trial court denied appellant's post-verdict motions and formally sentenced him to death, with concurrent terms of one to two years for the additional offenses. Appellant now brings the following direct appeal pursuant to 42 Pa.C.S. § 9711(h).

While appellant does not specifically contest the sufficiency of the evidence to sustain his convictions, we are nonetheless required to determine if the evidence is sufficient to support his conviction for first degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh. denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). It is well established that the test for determining the sufficiency of the evidence is whether, viewing all of the evidence admitted at trial, together with all reasonable inferences therefrom, in a light most favorable to the Commonwealth as verdict winner, the trier of fact could have found that the defendant's guilt was established beyond a reasonable doubt. *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833 (1985).

In the instant case, the Commonwealth presented eye-witness testimony identifying appellant as Darren Brown's killer. Such evidence, when viewed in a light most favorable to the Commonwealth, was clearly sufficient to sustain appellant's conviction for first degree murder. Thus, we turn to the specific issues raised by appellant.

**8.** 42 Pa.C.S. § 9711(d)(7):

In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

In bringing the present appeal, appellant raises twenty-four allegations of prosecutorial misconduct and nine additional claims of error which he claims constitute grounds for a new trial. These claims fall into three general categories.

## I.

## Appellant's Evidentiary Claims

■ In bringing the present appeal, appellant raises nine claims concerning the admission of evidence at trial. In reviewing such claims, we are guided by the rule of law that the admissibility of evidence is a matter addressed to the sound discretion of the trial court and that an appellate court may only reverse upon a showing that the trial court abused its discretion. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). Examination of appellant's evidentiary claims under this standard reveals them to be meritless.

■ Appellant's first three contentions concern the statements of Hiram Smith, a Commonwealth witness who had been an eyewitness to the shooting. At trial, Smith testified that he had been unable to identify Darren Brown's assailant. In response to this testimony, the prosecution introduced a statement made by Smith to police on July 10, 1990, in which he had identified appellant as Darren Brown's killer after viewing an array of eight photographs. Appellant now argues that the trial court erred in admitting the prior inconsistent statement of Hiram Smith as substantive evidence. This allegation is completely without merit in light of our holding in *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992).

In *Lively*, we dealt with a defendant's challenge to his judgment of sentence for murder in the first degree and possession of an instrument of crime on the ground that the prior inconsistent statements of three Commonwealth witnesses had been improperly admitted as substantive evidence. We subsequently reversed the judgment of sentence against the defendant and remanded the case for a new trial on the ground that two of the statements challenged by the defendant had been improperly admitted as substantive evidence.

In doing so, we held that a witness' prior inconsistent statement could only be admitted as substantive evidence when the statement had been given under oath at a formal legal proceeding, reduced to writing and signed by the declarant, or recorded verbatim contemporaneously with the making of the statement.

Under the present facts, Detective William Coogan recorded Smith's statement verbatim, reducing it to writing as Smith made the statement. Smith then signed each page of the written statement. Such a statement, which was not only recorded verbatim contemporaneously but also reduced to writing and signed by the declarant, clearly satisfies the requirements of *Lively*. Thus, it was properly admitted as substantive evidence which could be referred to by the prosecution in its closing argument.

Appellant next challenges the admission of a portion of the testimony of Detective William Coogan. The detective testified that Smith's identification of appellant had taken place in the detective's car after Smith had indicated that his wife was in his apartment, and that he did not wish to talk to the detective in front of her, because both she and her mother were pressuring him not to testify. Appellant contends that this testimony should have been excluded as double hearsay, since it included Smith's out of court statement as well as Smith's wife's threats to Smith. We disagree. Detective Coogan's testimony never mentioned a statement by Hiram Smith's wife. Furthermore, Smith's statement to Detective Coogan was clearly admissible since it was not introduced for the truth of the matter asserted, but rather, to display Smith's state of mind. The fact that Smith was considering the idea of not testifying against appellant would seem to discredit his subsequent testimony in which he renounced his identification of appellant. Thus, under the present facts, Smith's state of mind at the time of his discussion with Detective Coogan was relevant and the evidence displaying it was properly admitted under the "state of mind" exception.

18

Appellant also alleges that the trial court erred in admitting a statement made by Smith during an incident which occurred on September 12, 1990. Detective Coogan testified that on that date he was driving Smith, David Webb, Marcus Watson and Wendell Brown back to West Philadelphia after the four had viewed a lineup in which appellant was included. According to Coogan, Marcus Watson and Wendell Brown, both of whom had quickly identified appellant as Darren Brown's slayer, began chastising Smith for not identifying appellant, stating that he had not done the right thing. Smith had then stated that he would straighten matters out and finally that he would testify. Appellant now asserts that this statement was improperly admitted hearsay. Such an argument, however, ignores that the statement was admissible both as a prior inconsistent statement on the part of Smith and as evidence of Smith's state of mind. Thus, the trial court did not abuse its discretion in admitting the statement.

Appellant next alleges the trial court erred in allowing the prosecution to question Tameka Brown as to whether she had defied her parents wishes in order to see appellant, and also as to whether she had continued to date appellant after appellant had become involved in a fistfight with her stepfather that had to be stopped by the police. This claim is meritless. Under the present facts, evidence of Ms. Brown's unwavering allegiance to appellant, even after he had come to blows with a member of her family and had been forbidden to see him, was clearly relevant in order to show the witness's bias in favor of appellant. The evidence was, therefore, properly admitted to impeach her credibility.

Appellant also contends that he was deprived of a fair trial through the admission of other crimes evidence during the cross-examination of Ms. Brown. Specifically, appellant asserts that he was prejudiced when Ms. Brown admitted that she was aware that appellant was a fugitive for another crime unrelated to the murder of Darren Brown when she took him into her house on June 26, 1990.

 The often-stated rule in Pennsylvania governing evidence of other crimes is that such evidence is not admissible solely to show a defendant's bad character or propensity for continuing criminal acts. *Commonwealth v. Seiders*, 531 Pa. 592, 614 A.2d 689 (1992). However, not all references which may indicate prior criminal acts warrant reversal. Mere passing references "to prior criminal activity will not require reversal unless the record illustrates definitively that prejudice resulted from the reference." *Commonwealth v. Nichols*, 485 Pa. 1, 4, 400 A.2d 1281, 1282 (1979). In addition, it is also well established that evidence of other crimes may be admitted where there is a legitimate evidentiary purpose for such evidence. Some of the exceptions recognized by this court for the admission of such evidence

> include, but are not limited to, 1) motive; 2) intent; 3) absence of mistake or accident; 4) a common scheme, plan or design embracing commission of two or more related crimes so related to each other that proof of one naturally tends to prove the others; or 5) to establish identity of the person charged with the commission of the crime on trial where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other; 6) to impeach the credibility of a defendant who testifies in his trial; 7) situations where a defendant's prior criminal history had been used by him to threaten or intimidate the victim; 8) situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development. . . .

*Seiders*, 531 Pa. at 545–546, 614 A.2d at 689 (citing *Commonwealth v. Billa*, 521 Pa. 168, 177, 555 A.2d 835, 840 (1989)) (citations omitted).

 In the case at bar, the evidence that Ms. Brown harbored appellant even though she was aware that he was a fugitive for a previous murder was clearly admissible to impeach her credibility by establishing bias, for the incident

constituted yet another manifestation of her unquestioning allegiance to appellant.[9]

Furthermore, even assuming arguendo that this evidence was improperly admitted, its admission merely constituted a harmless error. It is well established that an error may be deemed harmless when the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. *Commonwealth v. Story,* 476 Pa. 391, 412, 383 A.2d 155, 166 (1978). Under the present facts, any prejudice appellant suffered by the admission of this evidence was slight since the specific crime for which appellant was wanted was never mentioned. In addition, the eyewitness testimony of Wendell Brown and Marcus Watson, both of whom identified appellant as Darren Brown's killer, overwhelmingly established appellant's guilt. Thus, even if Ms. Brown's passing reference to appellant's previous crime was improperly admitted it cannot be said to have contributed to the verdict. However, as previously noted the admission of this evidence did not constitute an abuse of discretion since it was admissible to show Ms. Brown's bias in favor of appellant.

Appellant next argues that the trial court improperly admitted a rap song recorded by appellant's rap group the "Plush Brothers." The lyrics to this song were not transcribed; however, appellant has included the following selection of lyrics in his brief:

You gotta prove you ain't soft like a nerf,

So you grab your f__kin' lead.

Nothin' said but [pop][10] to the head.

---

9. We in no way hold that the mere fact that a witness has knowledge of a defendant's prior criminal record or befriended the defendant after the defendant had been convicted of an offense may serve as the basis for the introduction of other crimes evidence. Rather, we only hold that in order to show bias on the part of a defense witness, the prosecution may mention a crime previously committed by a defendant when the witness either aided the defendant in committing the offense or in eluding prosecution for the crime.

10. "Pop" indicates a simulated gunshot.

[pop, pop, pop]

Make sure he's dead.

So you wipe off your barrel, as he bled.

Street life ain't always fun.

(Appellant's brief at 28). Appellant claims that this evidence was irrelevant since the song does not deal with the murder now in question, and hence should have been excluded. Such an argument, however, ignores that the song in question was introduced in response to testimony on direct examination in which appellant had portrayed himself as a college student and an artist. The fruits of appellant's artistic leanings were clearly relevant to rebut this testimony.

Appellant further asserts that even if this evidence was relevant, the trial court abused its discretion in failing to exclude the evidence on the ground that its probative value was outweighed by its prejudicial impact. In support of this contention, appellant cites our holdings in *Commonwealth v. Roman*, 465 Pa. 515, 351 A.2d 214 (1976), *appeal after remand*, 478 Pa. 619, 387 A.2d 661, *cert. denied, Roman v. Pennsylvania*, 439 U.S. 934, 99 S.Ct. 328, 58 L.Ed.2d 329 (1978), and *Commonwealth v. Stanley*, 484 Pa. 2, 398 A.2d 631 (1979). In *Roman*, we held the trial court had erred in admitting evidence of incidents in which the defendant had fired shots at the feet of a female patron in a bar, beaten a man, and killed a calf with a hammer, on the ground that these incidents were in no way relevant to the charges against the defendant. Similarly, in *Stanley*, we held that evidence that the defendant was threatening people with a pistol prior to the murder in question was inadmissible since it was irrelevant in establishing the defendant's mental state at the time of the murder of the victim.

Appellant's reliance on these cases in support of the proposition that the present evidence should be excluded due to its prejudicial impact, however, is misplaced for the evidence in both cases was determined to be inadmissible on relevancy grounds, not due to the prejudice created by the evidence. This is not the case in the present matter in which appellant's

rap song, as previously noted, was clearly relevant. Further-more, both *Roman* and *Stanley* involved the admission of incidents of actual violent acts as opposed to a literary or artistic work which merely contained violent material. We have previously held in *Commonwealth v. Abu–Jamal*, 521 Pa. 188, 555 A.2d 846 (1989), that the admission of a literary work in which the defendant had stated that "power grows out of the barrel out a gun" was relevant to rebut character testimo-ny that the defendant was a "peaceful and genial" man, and that the relevance of such evidence was not outweighed by its prejudicial effect. In light of this holding, the trial court's decision to admit the Plush Brothers rap song in the present case was not an abuse of discretion.

The seventh evidentiary claim raised by appellant alleges the trial court erred in admitting the prior inconsistent statement of defense witness Kerry Pleasant. At trial, Pleas-ant testified that appellant had called him on the evening of June 26, 1990 (the evening of the shooting), and asked Pleas-ant to pick him up at 6:00 a.m. on the morning of June 27, 1990. According to Pleasant, appellant called again at 5:30 a.m. on June 27th to wake Pleasant up. Pleasant then picked up appellant and drove him to North Philadelphia. In re-sponse to this testimony, the Commonwealth introduced a previous statement made by Pleasant to the police in which Pleasant stated that appellant had called him at 5:30 a.m. on the morning of the 27th. The statement, however, made no mention of a call on the evening of the murder. Appellant now argues that this statement was consistent with Pleasant's testimony at trial and should not have been admitted. This claim is absurd. Pleasant testified at trial that he spoke with appellant on the evening of June 26. His statement to police, however, makes no mention of such a conversation. This is an obvious inconsistency which provided a basis for the admission of the statement as a prior inconsistent statement.

Appellant also asserts that he is entitled to a new trial on the ground that the trial court improperly noted the inconsis-tency between Pleasant's testimony and his previous state-ment. We have previously discussed the role of a trial judge

in *Commonwealth v. Webster*, 517 Pa. 578, 583, 539 A.2d 804, 806–7 (1988), where we stated,

"Judges should refrain from extended examination of witnesses; they should not during the trial indicate an, opinion on the merits, a doubt as to the witnesses credibility, or to do anything to indicate a leaning to one side or the other without explaining to the jury that all these matters are for them." (Citations omitted.) *Commonwealth v. Seabrook*, 475 Pa. 38, 44, 379 A.2d 564, 567 (1977). However, as we noted in *Commonwealth v. Goosby*, 450 Pa. 609, 611, 301 A.2d 673, 674 (1973):

Every unwise or irrelevant remark made in the course of the trial by a judge, does not compel the granting of a new trial. *A new trial is required when the remark is prejudicial; that is, when it is of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial.* (Citations omitted.) (Emphasis in original.)

*Id.*

Appellant objects to the trial court's statement "there are two different statements here," which was made following defense counsel's objection to the introduction of Pleasant's prior inconsistent statement. Appellant claims this remark was so prejudicial that it deprived him of a fair and impartial trial. In support of this position, he cites our holdings in *Commonwealth v. Hammmer*, 508 Pa. 88, 494 A.2d 1054 (1985), and *Commonwealth v. Webster*, 517 Pa. 578, 539 A.2d 804 (1988). We are unpersuaded by this argument. The trial court's comment was merely a brief and accurate explanation of why the trial court was overruling appellant's objection. The comment did not impugn the witness' credibility, nor did it in any way insinuate that Pleasant's statement to the police was more believable than his testimony at trial. Thus, the instant case is clearly distinguishable from the actions of the trial judges in *Hammer*, in which the court extensively questioned witnesses in such a manner as to undermine their credibility in favor of the prosecution, and in *Webster*, in which

24

the court made a highly prejudicial comment that the defense's expert was not as credible as the expert witnesses testifying for the Commonwealth. Appellant's claim is without merit.

Appellant's final evidentiary claim challenges the admission of evidence during the sentencing phase of the proceedings. Specifically, appellant alleges the trial court improperly admitted evidence that his uncle, George Walton, who had resided with appellant's family during appellant's childhood, had been charged with murder as had appellant's brother, Victor Ragan and that Victor had also been charged with threatening witnesses at appellant's previous trial. This evidence, however, was introduced in response to the assertions of appellant's mother on direct examination that appellant had been a warm and loving son whose childhood had been one of playful innocence. Thus, the trial court did not abuse its discretion in admitting the evidence in question since it was clearly relevant to show that appellant's childhood was not one of conventional youthful exuberance and innocence but rather was a period of constant exposure to violence.

## II.

### The Examination of Witnesses

Thirteen of the claims raised by appellant allege that appellant is entitled to a new trial on the ground that the Commonwealth committed prosecutorial misconduct during its examination of various witnesses.[11] It is well established that a claim of prosecutorial misconduct will only constitute grounds for relief when the unavoidable effect of the contested comments was to "prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict." *Commonwealth v. Chester*, 526 Pa. 578, 599, 587 A.2d 1367, 1377, *cert. denied*, 502 U.S. 849, 112 S.Ct.

11. These claims are raised in issues I (1, 2, 4, 5, 7, 9, 10, 11, 18, 21), II, and I (19), respectively, of appellant's brief. However, for the sake of convenience we will address them seriatim.

152, 422, 116 L.Ed.2d 117, 442 (1991) (citing *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 53–54, 454 A.2d 937, 956–957 (1982)). In the present case, the ten claims raised by appellant concerning the examination of witnesses by the prosecution fall far short of this standard. In fact, most of the claims are based on little more than evidentiary objections of defense counsel which were sustained by the trial court.

## A.

### Attempt To Use Demonstrative Evidence

 Appellant first alleges that the prosecution committed misconduct when it attempted to have a police firearms expert use a nine millimeter semi-automatic pistol obtained from the police reference collection to demonstrate how a semi-automatic handgun ejects shell casings, but was prohibited from doing so by the trial court. This claim is simply meritless. The mere sustaining of an evidentiary objection does not give rise to an incident of prosecutorial misconduct.

Under the present facts, the prosecution's attempt to demonstrate the operation of a semi-automatic handgun followed an extensive discussion regarding the position of shell casings at the crime scene. In addition, previous statements by witnesses to the crime had indicated that the weapon used in the shooting had been a semi-automatic pistol.[12] Thus, the Commonwealth's attempt to introduce the evidence was in good faith and, indeed, was perfectly reasonable in light of *Commonwealth v. McAndrews*, 494 Pa. 157, 430 A.2d 1165 (1981). In *McAndrews* we held it to be within the trial court's discretion to permit a demonstration with a gun similar to that used in the crime in question in order to illustrate an expert's relevant testimony. Furthermore, contrary to appellant's allegations, the record in no way reflects that the gun was mishandled or "waved" before the jury so as to create the type of bias necessary to sustain a claim of prosecutorial misconduct. Thus, appellant's claim clearly fails.

12. Eyewitness Hiram Smith had previously told police and testified at trial that the gunman had "emptied the clip" of his nine-millimeter. (T.T. 9/24/91 at 553).

**B.**

### Questions Implying The Existence Of Facts

Appellant's next eleven allegations of misconduct allege that the prosecutor improperly asked questions which implied the existence of facts not shown in the record. In support of these claims, appellant cites our holding in *Commonwealth v. Smith*, 457 Pa. 638, 326 A.2d 60 (1974).[13]

In *Smith*, we dealt with a defendant's challenge to a sentence of life imprisonment following his conviction for murder in the first degree. The defendant, who was a first time offender, claimed, inter alia, that reversible error had been committed when the prosecution asked the defendant's mother on cross-examination, whether the defendant had previously been charged with any crimes and convicted. Specifically, the defendant alleged that, despite the fact that the witness had answered "no", such a question had created in the minds of the jurors an impression that the defendant had previously been convicted of a crime. *Id.* at 643–4, 326 A.2d at 62.

In rejecting this claim we initially noted that questions which imply the existence of an unsupported factual predicate and which attempt to create impressions of guilt may not be asked. We subsequently held, however, that the remarks in *Smith*, while improper, did not constitute grounds for relief since we were unconvinced that such an isolated question had been calculated to generate an impression of guilt or had deprived the defendant of a fair trial. Having reviewed the claims now raised by appellant, we reach the same conclusion.

**13.** Appellant also cites the Superior Court's holdings in *Commonwealth v. Larkins*, 340 Pa.Super. 56, 489 A.2d 837 (1985), and *Commonwealth v. Hickman*, 319 Pa.Super. 261, 466 A.2d 148 (1983). We initially note that we are not bound by the holdings of these lower court rulings. Furthermore, both of these cases are easily distinguished. In *Larkins*, the Superior Court held that the remarks in question did not constitute prosecutorial misconduct since the answers to the questions had actually benefitted the defense, and had been accompanied by, and had been made under a good faith belief that the evidence upon which the questions were based would be admitted at trial. *Hickman* concerned a continuing course of outrageous conduct on the part of the prosecutor which is simply not present in the case at bar.

 Appellant's initial claim regarding the prosecution's alleged implication of facts contends that the prosecution committed misconduct when it attempted to question Marcus Watson (a witness for the Commonwealth) about Watson's attempts to encourage other witnesses to the shooting to come forward and testify for the prosecution. We find this claim unpersuasive in light of *Smith*. The possible impact of a question regarding such a collateral issue would appear to pale in comparison to the prejudicial impact of a question implicating a defendant in prior criminal activity, which *Smith* found to be insufficient to destroy the jury's ability to view the evidence in an objective fashion. Appellant's claim, therefore, does not provide a basis for relief.

Appellant's next three allegations of misconduct concern the prosecution's examination of Hiram Smith.

 Appellant first contends that the prosecutor was guilty of misconduct warranting a new trial when he asked the following question following the introduction of Smith's prior inconsistent statement:

> Does the fact that your mother-in-law or family member sometime lives in the same neighborhood (in which the shooting occurred) cause you to change your testimony in this case?

(T.T. 9/24/91 p. 613). Appellant asserts that this question warrants the grant of a new trial on the ground that it insinuated that members of Smith's family had been threatened by appellant and his friends and relatives. This argument, however, ignores the fact that such a question was clearly proper under our holding in *Commonwealth v. Carr*, 436 Pa. 124, 259 A.2d 165 (1969), in which we stated,

> Threats by third persons against public officers or witnesses are not relevant unless it is shown that the defendant is linked in some way to the making of the threats....

> However, that rule refers to the relevance of a threat as it bears upon the issue of guilt. Here, tt.e purpose was not to establish guilt, but to explain a prior inconsistent statement, a permissible use....

*Id.* at 127, 259 A.2d at 167. In light of this precedent, the prosecution's questioning of Smith concerning threats to his family was clearly permissible in order to explain Smith's prior inconsistent statement and does not constitute a basis for relief.

■ Appellant, likewise, asserts that the prosecutor improperly questioned Smith regarding the fact that Smith had moved to Georgia upon the receipt of his first court notice, and was now recanting his previous identification of appellant. Like appellant's previous claim, this argument clearly fails for it once again ignores the relevance of such evidence to explain Smith's prior inconsistent statement.[14]

■ Appellant's final claim regarding Smith's examination alleges the prosecution committed misconduct when it implied that defense counsel had been the first to mention that Smith was now living in Georgia. A review of the record reveals that it was the prosecution which had first made note of this fact. Any confusion created by this remark, however, was cured when the trial court correctly instructed the jury that they should use their own recollection as to what had been stated in this regard and who mentioned it first. Further, we agree with the trial court that it is difficult to imagine how a remark on such a trivial issue could possibly have so prejudiced the jury as to render them incapable of objectively assessing the evidence. Thus, we find this claim unpersuasive.

Appellant next alleges that the prosecutor committed misconduct warranting a new trial during the examination of defense witness Tyrone Simmons. On cross-examination, Simmons had stated that he had known appellant since the summer of 1990. In response, the Commonwealth introduced a sworn statement made a month before trial in which Simmons had stated that he did not know appellant. This contradiction led to the following exchange between the prosecutor and the witness:

14. Appellant also challenges the prosecution's reference in closing argument to the fact that Smith had moved to Georgia. This argument, however, is clearly meritless since it was permissible for the prosecution to comment on evidence which was properly admitted.

Q. Then, my next question, sir, do you understand that if a person says one thing under oath one time and later on comes and says something completely different on the same subject later on, that such a person may be prosecuted for perjury.

A. Yes.

Q. Do you understand that?

A. Yes.

Q. At this point do you wish to confer with counsel of your own choice.

(T.T. 4/25/91 p. 755).

Appellant now contends that these comments by the prosecutor warrant a new trial. In bringing this claim appellant once again ignores the fact that every unwise or irrelevant remark made by counsel during the course of a trial does not compel the granting of a new trial. *Commonwealth v. Goosby,* 450 Pa. 609, 301 A.2d 673 (1973). Rather, as previously noted, a new trial is warranted only when the remarks in question so prejudice the jury so as to render it incapable of rendering a true verdict. Here the prosecutor's remarks to Simmons, although both argumentative and unwise, simply do not meet this standard. This is especially so in light of the trial court's immediate instruction to disregard the remarks. Thus, appellant's claim is without merit.

Appellant's claims regarding the prosecution's insinuations during the examination of Tameka Brown fail for the same reason. Appellant first objects to a question in which the prosecutor asked Brown, who was seventeen at the time of the incident, whether at such an age she was "vulnerable perhaps to adults or people that might use her in someway." Although argumentative, we find it unlikely that such a comment would render the jury unable to reach an impartial verdict.

Similarly, appellant contends that he was deprived of a fair trial when, after Ms. Brown had testified that she was unaware that appellant had claimed that she was his wife and

that she had never held herself out as his wife, the prosecutor stated, "[S]o if Derrick Ragan were to claim that you were his wife." This is yet another attempt on appellant's part to treat a peppercorn as a boulder. While the prosecutor's remark may have been unwarranted, it was not the sort of remark which would rob the jury of its impartiality.

Appellant next claims the prosecution improperly harassed him. The harassment consisted of questions as to whether he had actually been at the scene of the murder, had been armed, and had fled to North Philadelphia on the morning of the shooting in order to evade capture, after he had already testified on direct examination that he had not been at the scene of the crime, but rather had arrived at Tameka Brown's home at 5:00 p.m. on June 26, 1990. In raising this claim, appellant essentially asserts that the prosecution was required to accept his version of the facts given on direct examination. Such a claim is absolutely ludicrous, since the very purpose of cross-examination is to undermine the testimony introduced by the opposing side on direct examination. Thus, appellant's claim clearly fails.

Appellant's final three claims regarding the prosecution's alleged insinuation of facts concern the examination of appellant's mother, Inez Ragan, during the sentencing phase of the trial. Appellant first asserts that the prosecutor committed misconduct when he questioned Ms. Ragan regarding appellant's possession of semi-automatic and non-automatic handguns at the time of the death of appellant's cousin, Albert Ragan, in 1989. Specifically, appellant contends that this line of questioning implied that appellant had been responsible for the death of Albert Ragan. We find this claim to be without merit in light of the fact that the prosecution never stated that appellant had been responsible for Albert Ragan's death, but rather, merely asked whether appellant had been in possession of certain firearms around that time. Furthermore, any prejudice caused by the question was cured by the trial court's immediate cautionary instruction.

Appellant next contends that he was prejudiced when the prosecution asked Ms. Ragan whether she was aware of the fact that two of appellant's associates and fellow members of the rap group Plush Brothers, Nicholas Porter and Andre Summerville, had been previously been involved in murders. This claim does not provide a basis for relief. In the present case, such a question was proper since Ms. Ragan's knowledge of her son's association with such violent individuals was clearly relevant in order to impeach Ms. Ragan's previous assessment of appellant's character, in which she had described appellant as a warm and loving son. The fact that the trial court chose not to allow such questioning does not provide a basis for a successful claim of prosecutorial misconduct.

Appellant's final claim regarding the examination of Ms. Ragan alleges the prosecutor committed misconduct when, after Ms. Ragan had agreed that she had tried to explain to appellant how he should react to instances of violence around him, remarked "evidently without success." While we agree that such a remark was unwarranted, it does not provide a basis for a claim of prosecutorial misconduct since, like most of the claims raised by appellant, it was not sufficiently prejudicial to render the jury incapable of returning a fair verdict. Thus, appellant's claims regarding the prosecution's implication of facts during the examination of witnesses do not provide a basis for relief.

## C.

### Appellant's Post–Arrest Silence

Appellant's final claim concerning the prosecution's examination of witnesses alleges that he was denied a fair trial when the prosecutor improperly commented on the failure of various defense witnesses to come forward following his arrest, and on appellant's own post-arrest silence.

Appellant's claim regarding the prosecution's attempt to impeach three of appellant's alibi witnesses by noting their failure to proclaim appellant's innocence at the time appellant

was arrested and charged with the murder of Darren Brown is easily addressed. We have previously held that,

> [i]t is hornbook evidentiary law that a witness may be impeached by showing that, on a prior occasion, he or she engaged in conduct inconsistent with testimony given at trial. *See* 3A Wigmore, *Evidence*, § 1042 (Chadbourne rev. 1970). *See also Commonwealth v. Turner*, 499 Pa. 579, 583, 454 A.2d 537 (1982). A corollary to this rule is that
>
>> [i]f a witness had been under a duty to speak on a prior occasion, or *if it would have been natural for the witness to have spoken on such an occasion*, but the witness remained silent, the witness may be impeached by showing that the present testimony included a fact as to which he had been silent on a prior occasion. Torcia, *Wharton's Criminal Evidence* § 436 (14th ed. 1986) (emphasis added).

*Commonwealth v. Lane*, 521 Pa. 390, 397, 555 A.2d 1246, 1250 (1989). In the case at bar, defense witnesses Tyrone Simmons, Daniel Hunter, and Tameka Brown all testified that at the time they learned of appellant's arrest they had been aware that someone other than appellant had murdered Darren Brown. It would only seem natural that one in possession of such information would have immediately contacted the authorities in order to exculpate an individual who they supposedly knew was wrongly accused. Thus, the prosecution was entitled to impeach their credibility by bringing out the fact that they failed to take any such action. Appellant's claim regarding the post-arrest silence of defense witnesses, therefore, is without merit.

Appellant's claim regarding the prosecution's alleged comment on appellant's own post-arrest silence, however, raises a more difficult issue, we have previously held in *Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982), that it is impermissible for a prosecutor to impeach the testimony of a defendant by referring to the defendant's post-arrest silence. In *Turner*, we dealt with a defendant's challenge to his judgment of sentence following his convictions for voluntary manslaughter and possession of an instrument of a crime. At

trial the defendant maintained that the shooting giving rise to the charges against him had been committed in self-defense. Specifically, the defendant alleged that at the time of the shooting he had disarmed the victim when he noticed a drug dealer standing behind the victim with a gun. The defendant then claimed that he had fired the gun in an effort to save himself and had accidentally struck the victim. In response to this claim of self-defense, the prosecutor had asked the defendant on cross-examination, "Did you ever tell the police that somebody was shooting at you." *Id.* 499 Pa. at 581, 454 A.2d at 538.

We subsequently granted the defendant a new trial on the ground that this reference to the defendant's post-arrest silence had constituted an impermissible violation of the defendant's right against self-incrimination under Article 1, § 9 of the Pennsylvania Constitution. We based this decision on the conclusion that the such a reference was not sufficiently probative of an inconsistency with the defendant's in court testimony so as to outweigh the substantial prejudice created by a reference to the defendant's post-arrest silence. Hence, we held that, absent an assertion by the accused while testifying at trial that he related a claim of self defense to the police at the time of arrest, the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial.

Appellant now cites two remarks by the prosecutor which he claims constitute improper references to his post-arrest silence and warrant a new trial. These remarks both occurred during the following exchange between the prosecutor and appellant:

Q. Do you remember when the police formally charged you in the arraignment court with the murder of Darren Brown?

A. Yes. Is this when they took me to 8th and Race?

Q. Yes.

A. Yes.

Q. *Now, at some point thereafter, did it dawn on you, well, gee, they can't be charging me with this murder I was with Tameka?*

Mr. Tinari: Objection.

The Witness: No.

Mr. Tinari: I move for a mistrial.

The Court: Just a moment. I will sustain the objection to the last question and ask the jury to disregard the last question.

Mr. Colihan: All Right.

The Court: I will sustain the objection to the last question. The jury is not to consider it in anyway.

Mr. Colihan: All Right.

By Mr. Colihan:

Q. *Did you at some point tell anybody that you were with Tameka at the time that you were charged with killing Darren Brown?*

Mr. Tinari: Objection.

The Court: Sustained.

Mr. Tinari: I move for a mistrial.

The Court: I will deny your motion. I will give an instruction to the jury.

(T.T. 9/26/91 pp. 956–957) (emphasis added). While this dialogue contains two possible references to appellant's post-arrest silence, we find that both remarks can be distinguished from the remark which warranted a new trial in *Turner.*

 Unlike the question posed by the prosecution in *Turner,* neither of the questions asked by the prosecutor in the instant case specifically mentioned whether appellant had spoken with the police. Indeed, the prosecution's remark regarding whether it had "dawned" on appellant that he should not have been charged with the murder of Darren Brown does not refer to speech at all, but rather, deals with appellant's cognitive process. The prosecutor's question as to whether appellant had ever told anybody that he was wrongly accused, meanwhile, not only fails to mention the police, but is

also ambiguous as to whether it refers to post or pre-arrest silence. In light of these distinctions, the comments in the instant case cannot be said to have had the sort of prejudicial effect which warranted a new trial in *Turner*. This is especially so in light of the thorough cautionary instruction given by the trial court immediately after the prosecutor had made these remarks. As a result, appellant's post-arrest silence claim does not warrant a new trial.

## III.

### Comments During Closing Argument

Appellant next raises eleven claims of prosecutorial misconduct arising from the prosecution's closing argument. As in cases dealing with remarks made during the examination of witnesses, our standard in determining whether a remark made during the prosecution's closing argument warrants a new trial is "whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict." *Commonwealth v. Chester*, 526 Pa. at 549, 587 A.2d at 1377. Examination of appellant's claims in light of this standard reveals them to be without merit.

Appellant first asserts that the prosecutor improperly personalized the trial when he stated that he never had a brother. This claim ignores the context in which this comment occurred. In the course of his summation, the prosecutor, while discussing the credibility of Wendell Brown, argued that although he never had a brother, he could imagine and the jury could measure whether the emotional effect of the murder of Wendall Brown's brother would facilitate his desire to remember the features of his brother's murderer. Such a comment focused the jury on the evidence and its role as the factfinder. Thus, it was permissible and does not provide a basis for relief.

Appellant next claims the prosecution deprived him of a fair trial by asking the jury to find appellant guilty as a

personal act for the victim. This argument is unsupported by the record. Indeed, the record indicates that the comment was in reality a reminder to the jury of the gravity of their task. As the prosecutor stated, "Justice cannot fail here. We cannot have a failure of justice. A man's life has been taken, and a person is accused of doing that." (T.T. 9/27/91 p. 1085). Such a remark was not improper.

Appellant further alleges that the prosecutor asked the jury to find appellant guilty as a personal act for the victim when he stated, "I owe it to the Brown family." In making this claim, appellant once again attempts to build a claim on a single line of the record taken out of context. The remark he refers to occurred during the following portion of the prosecutor's summation:

Now turning to those witnesses. Let us see whether or not their testimony stacks up. I don't want to dwell on this. You don't need me or anybody else to tell you what people said. I am only reviewing it because it does bear some reviewing, and I owe it to the Brown family, and I owe it to you, to show you what my recollection is of the testimony.

(T.T. 9/27/91 p. 1078). These comments correctly emphasized that the jury's recollection of the evidence controlled. That the prosecution also mentioned that he had a duty to the family of the murder victim to give a summation of that evidence was simply the truth. It does not warrant a new trial.

The fourth claim raised by appellant concerning the prosecution's closing contends that he is entitled to a new trial on the ground that the prosecutor told the jury that the Commonwealth was not all-knowing. We are baffled as to how appellant can claim to have been prejudiced by such a remark unless it was part of his trial strategy to prove that the prosecutor in this case was omniscient. Since we have serious doubts as to the efficacy of such a strategy, this claim clearly fails.

Appellant next contends that the prosecutor made an improper appeal to the jury's emotions when he stated that

the victim had been "shot like a dog." We have previously held, however, that similar remarks did not constitute a deliberate attempt to destroy the objectivity of the fact finder, but rather, were merely summaries of the evidence presented with the oratorical flair permitted during argument. *See Commonwealth v. Chester*, 526 Pa. at 598, 587 A.2d at 1377 (prosecutor stated that the defendants had treated the victim like a piece of cheap tenderloin). Thus, appellant's claim is without merit.

Appellant also complains that the prosecutor committed misconduct when he noted that no evidence had been introduced that defense witnesses did not have criminal records. This claim is meritless for it ignores the fact that this remark was made in response to defense counsel's assertion during closing argument that the witnesses called by the defense had no criminal records, a fact which was not established at trial.

Appellant next argues that the prosecution improperly asserted that if a defense witness was trying to mislead, he must be guilty of a crime and trying to protect himself. This claim, however, fails for the record reflects that the prosecutor did not say what he is accused of saying. Rather the prosecution's summation contained the following statement: "if you conclude that [a] person has lied to you and tried to mislead you, you *may* conclude that person is doing something for evil motives, maybe even to protect himself, where he knows that he is guilty" (T.T. 9/27/91 pp. 1081–1082) (emphasis added). Such a statement is correct for it is the sole province of the factfinder to believe all, part or none of the evidence. *Commonwealth v. Jackson*, 506 Pa. 469, 485 A.2d 1102 (1984).

Appellant's eighth claim arising from the Commonwealth's closing argument alleges the prosecution generalized the significance of the trial above and beyond the actual issues before the jury. Appellant has failed to explain how the prosecution perpetrated this alleged wrong and has failed to cite any portion of the record supporting this contention. As a result this claim constitutes the exact sort of boilerplate allegation which we have held to provide no basis for relief. *See*

*Commonwealth v. Hentosh*, 520 Pa. 325, 554 A.2d 20 (1989); *Commonwealth v. Hutchinson*, 521 Pa. 482, 556 A.2d 370 (1989); *Commonwealth v. Pettus*, 492 Pa. 558, 424 A.2d 1332 (1981).

Appellant next contends that the Commonwealth improperly suggested that the jury's failure to convict appellant would be a failure of justice. This claim is without merit for it is the prosecutor's job to argue that the evidence introduced at trial has established a defendant's guilt beyond a reasonable doubt and that hence, the conviction of the defendant is the just result at which the jury should arrive.

Appellant also alleges that the prosecution improperly stated that appellant had presented a lying alibi defense. It is well-established that a prosecutor may not inject a highly prejudicial personal opinion of a defendant's credibility into evidence, thereby intruding upon the jury's exclusive function of evaluating the credibility of witnesses. *Commonwealth v. Kuebler*, 484 Pa. 358, 363, 399 A.2d 116, 118 (1979) (citing *Commonwealth v. Potter*, 445 Pa. 284, 287, 285 A.2d 492 (1971)). In light of this rule, we have held that a prosecutor's broad characterization of a witness' testimony as a big lie constitutes reversible error. *Id.* 484 Pa. at 364, 399 A.2d at 119. However, we have also found that a prosecutor's assertion that a witness had lied does not warrant a new trial when the statement was a fair inference from irrefutable evidence rather than a broad characterization. *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984). Under the present facts, the prosecutor followed his statement that appellant had presented a lying alibi defense with a recitation of the various incidents introduced at trial which indicated the bias of appellant's alibi witness Tameka Brown. Thus, the assertion that appellant's alibi defense had been fabricated was a fair inference based on the evidence and does not warrant a new trial.

Appellant's final claim concerning the prosecution's summation alleges that the prosecutor referred to theories unsupported by the evidence when he noted in closing that Hiram

Smith had left town upon receipt of his court notice and now lived in Georgia. As previously noted, this evidence was properly admitted in order to explain Smith's prior inconsistent statement. Thus, the prosecutor was perfectly justified in referring to this evidence during his summation. Hence, this claim, like the rest of appellant's claims, does not provide a basis for relief.

## IV.

### Proportionality of Sentence

■ In light of the failure of appellant's claims, we are required to conduct one final inquiry to determine the proportionality of appellant's sentence as required by 42 Pa.C.S. § 9711(h)(3)(iii). Based upon our review of the statistical data provided by the Administrative Office of the Pennsylvania Courts, see *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we conclude that the sentence of death received by appellant was not disproportionate to the penalty imposed in similar cases. Appellant's sentence of death is affirmed.[15]

CAPPY, J., files a concurring opinion in which FLAHERTY, J., joins.

MONTEMURO, J., is sitting by designation as Senior Justice pursuant to Judicial Assignment Docket No. 94 R1801, due to the unavailability of ROLF LARSEN, J., see No. 127 Judicial Administration Docket No. 1, filed October 28, 1993.

CAPPY, Justice, concurring.

Although I am in agreement with the conclusions reached in the majority opinion, I am compelled to write separately to address the majority's creation of a new exception to the general rule prohibiting evidence of the defendant's prior

---

15. The Prothonotary of the Supreme Court is directed to forward a complete record of this case to the Governor's Office for his review.

criminal activity.[1] On this particular issue I part company with the rationale of the majority.

At issue here was the testimony of Tameka Brown, the girlfriend of the defendant. The evidence at trial revealed that after the murder the defendant had fled to Ms. Brown's house. In an attempt to impeach Ms. Brown the prosecution asked if she was aware that the defendant was in trouble at that time. The following exchange occurred:

Q: You knew he was in trouble that night?

A: That is correct.

Q: Involving this case?

A: No. This—

Mr. Tinari (defense counsel): Objection.

At a side bar conference it was revealed that Tameka would have answered that she knew the defendant was in trouble for another case. That information was never heard by the jury. Although the defendant argues that this testimony could give rise to an inference of prior criminality on his part, that inference is not apparent on the record.

On the basis of what was actually heard by the jury in this case I see no reason for the majority to create a new exception to the general rule prohibiting reference to prior bad acts of a defendant. The majority latches on to the fact that the

---

1. *Commonwealth v. Seiders*, 531 Pa. 592, 614 A.2d 689 (1992) sets forth the general rule that evidence of a defendant's other crimes is not admissible unless there is a legitimate evidentiary purpose for such evidence. *Seiders* also sets forth the recognized exceptions to the general rule:

1) motive; 2) intent; 3) absence of mistake or accident; 4) a common scheme, plan or design embracing commission of two or more related crimes so related to each other that proof of one naturally tends to prove the others; or 5) to establish identity of the person charged with the commission of the crime on trial where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other; 6) to impeach the credibility of a defendant who testifies in his trial; 7) situations where a defendant's prior criminal history had been used by him to threaten or intimidate the victim; 8) situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development.

attempt of the prosecutor to show this witness had a bias is a legitimate reason to allow the introduction of other crimes evidence. That may be true. However, this Court may not take the liberty of creating new legal principles in a vacuum. In *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60 (1803), it was firmly established that the power to adjudicate applies only to controversies properly before the Court. *See, Silvestri v. Slatowski*, 423 Pa. 498, 224 A.2d 212 (1966) (The Court will not anticipate questions which are beyond the record). I cannot agree with such judicial activism.

Thus, my concern with the majority's disposition of this issue. The issue, as presented, is easily dismissed on the basis that this jury never heard any testimony from which they could infer prior bad acts by this defendant. Accordingly, on this issue I depart from the rationale of the majority and concur in result only.

FLAHERTY, J., joins this concurring opinion.